STRONG *v.* GRAND TRUNK WESTERN RAILWAY CO.

1. APPEAL AND ERROR—DIRECTED VERDICT—PROPRIETY—EXAMINATION OF EVIDENCE.

   In determining whether a verdict should have been directed for defendant, it is the duty of the court to accept as truthful the testimony offered on behalf of plaintiff, and to give to such testimony, when subject to different inferences, that most favorable to plaintiff.

2. RAILROADS —PERSONAL INJURIES —CROSSINGS —CONTRIBUTORY NEGLIGENCE.

   Plaintiff, in approaching a crossing of a railroad, had an unobstructed view of the track for 450 feet and attempted to cross without stopping to look or listen and was struck by a train running at the rate of 35 miles an hour. *Held,* that he was guilty of contributory negligence.

3. SAME—PERSONAL INJURIES—NEGLIGENCE—GROSS NEGLIGENCE.

   In such action, it appearing that whatever negligence was attributable to defendant occurred before the discovery of plaintiff's negligence, defendant could not be said to be guilty of gross negligence.

Error to Eaton; Smith, J. Submitted November 10, 1908. (Docket No. 130.) Decided March 30, 1909.

Case by Charles W. Strong against the Grand Trunk Western Railway Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Reversed, and no new trial ordered.

*Harrison Geer* and *William K. Williams*, for appellant.

*G. D. Blasier* and *Huggett & McPeek*, for appellee.

The following is the map referred to in the opinion:

MONTGOMERY, J. This action was brought to recover damages for the alleged negligence of defendant, resulting in a collision of the buggy in which plaintiff was riding with his wife, on the afternoon of August 30, 1907, with the defendant's west-bound passenger train at Charlotte, at about 5 o'clock in the afternoon. For a better understanding of the situation, a map which was introduced in evidence showing the surroundings is attached to this opinion. It will be seen that Cochrane avenue is a street 100 feet in width extending north and south and crossing defendant's tracks. Munson street is 60 feet in width, and intersects Cochrane avenue at 163.30 feet from the center of the north track and extends east to Washington avenue. The first house north of the track and on the east side of Cochrane avenue is $50\frac{1}{2}$ feet from defendant's north line fence, and the second house is $35\frac{1}{2}$ feet north of the first, and a barn is 85 feet north of the second house and some east. On the east side of Cochrane avenue, and north of this track, are also certain poles and a tree which may be noted, and there is along the right of way an embankment which to some extent interferes with the view. A crossing whistling post is placed some 600 feet northeast of the center of Cochrane avenue. The track rises from that point to Cochrane avenue 8.45 feet. Beech Bros.' foundry is 1,215 feet northeast of the center of Cochrane avenue. An open driveway extending west from Cochrane avenue through the Charlotte Manufacturing Company grounds is 25 feet north of the north rail. There are two tracks of this railroad; the northerly being used by west-bound trains, and the southerly by east-bound trains. There was testimony offered on the part of the plaintiff tending to show that the defendant's train approached this crossing from the northeast at an unusual and prohibited rate of speed, that the bell was not rung, and the whistle was not sounded at the whistling post. While the defendant's testimony very strongly disputed that offered by the plaintiff upon the question of the signals, there was enough of conflict to carry the case to the

jury.   The case was submitted to the jury, and a verdict found for the plaintiff.   This verdict is brought before us for review, and the questions presented are: *First,* whether there was negligence on the part of the defendant; *second,* whether the plaintiff was guilty of contributory negligence; and, *third,* whether the defendant was guilty of "gross or wilful negligence" within the legal meaning of that term.

We will first consider the question of the plaintiff's contributory negligence.   It is contended that the plaintiff is shown by his own testimony and that of his witnesses, taking the most favorable view which can be given it, to have been guilty of contributory negligence, as a matter of law.   In determining this question, the contention of plaintiff's counsel that the duty of the court is to accept as truthful the testimony offered on behalf of the plaintiff, and to give to such testimony, when subject to different inferences, that most favorable to the plaintiff, is accepted.

The plaintiff's testimony as to the manner in which he approached this crossing was as follows:

"I was coming down from Mr. Riddle's.   It was somewhere about 5 o'clock.   I was pretty well acquainted with the station there.   I knew where the Michigan Central crossing was.   I understood with reference to the trains running there and with regard to their stopping before crossing the Michigan Central track.   I started from Mr. Riddle's with the horse on a little shack.   I was looking and listening, coming down listening and looking until I got near the railroad track.   I could see everything clear. Nothing in sight.   Nothing could be heard.   I was listening.   My wife was listening also.   We were watching until—on both sides, looking ahead at the Michigan Central, nothing in the way, all clear.   The last look I gave was to the left, and that train was on me, and that—the whistle blew.   I did not hear any whistle for the crossing.   Until it was on me as near as that, I did not hear any bell ring.   I did not hear the train."

It is contended by plaintiff's counsel that this testimony shows conclusively that the plaintiff was looking and

keeping a constant lookout. It is true he testifies that he was looking and listening, but how constantly or at what places he does not definitely state, so that, if we are able to say, as contended by defendant's counsel, that for a distance of 80 feet or thereabouts before plaintiff reached the crossing with his horse, the train was in plain view, there is no obstacle to saying that the plaintiff could not have looked at the proper time in the direction of the approaching train.

The plaintiff caused certain tests to be made by Mr. Newcomb, Mr. Decke, and others, with a view of ascertaining at what distance from the track the approaching train would be visible to one approaching the track on Cochrane avenue riding in a buggy. Mr. Newcomb, who was county surveyor, testified that at a point 163.30 feet from the track, which would be at the center of the intersection of Munson street and Cochrane avenue, one sitting in a buggy could see 342 feet east of the center of Cochrane avenue. A rod farther south, or 146.80 feet from the track, he could see a man on the track 366 feet from the center of Cochrane avenue. Another rod farther south, or 130.30 feet from the track, he could see a man on the track 389 feet. Another rod farther south, or 113.80 feet from the track, he could see a man on the track 405 feet from the center of Cochrane avenue. Another rod nearer the track, or at 97.30 feet from the track, he could see a man 477 feet from the center of Cochrane avenue. And a rod farther south, which would be 80.80 feet from the track, a man could be seen 569 feet from Cochrane avenue. He added, in his testimony, "The next rod farther you could see as far as the switch turn post leading into Beech's factory. That would be 640 feet." He further testified:

"The last measurement that I made was at 48 feet north of the north rail. I could see down the line, and I stopped there. When I was 48 feet away, I could see the entire length, 1,615 feet. I could see the whistling post at that place."

He further testified that he presumed he could have seen a train of cars much farther than an individual. Plaintiff's counsel, in their reply brief, referring to the testimony of the witness Newcomb that he could see 569 feet north of Cochrane avenue at a point 80.80 feet from the crossing, say: "This is clearly a mistake. Mr. Newcomb explains this observation as having been made 48 feet from the track." And adds:

"There was absolutely no foundation for counsel to claim that the plaintiff at a point 80 feet from the crossing could have seen down the track 569 feet."

The explanation referred to of this witness on redirect examination was as follows:

"*Q.* How far were you north of the track when you made the last sight? That was the last sight, 48 feet. You could see the man at the switch at that time?

"*A.* Yes, sir.

"*Q.* Could you see the man any further at your sixth sight, any further than at the switch?

"*A.* That is the last time he stood there. When I drove up again I could see the whole length.

"*Q.* Then you were not 48 feet from the track when you could see clear down there, were you? You were 48 feet when you couldn't see down through according to your plat there.

"*A.* That is what I testified before. It was 48 feet when I took the last observation, and when I drove up I could see clear up there. This would be 28 feet."

This testimony, however, does not dispute the testimony given on cross-examination, that, at a point 80.80 feet from the crossing, a man could be seen at a distance of 569 feet from the crossing, for on cross-examination the testimony of this witness further shows that he made a further observation after this one, taken at a point 80.80 feet from the crossing, and that at that later observation a man could be seen at a distance of 640 feet. This observation may have been taken at a distance of 48 feet from the rail, but there is no retraction of the statement that at 80.80 feet he could see a man at a distance of 569

feet. If this were in doubt, the testimony of Mr. Decke, on cross-examination, would corroborate the statement of the witness. He fixed the distance at which an individual could be seen from the track as still greater than that fixed by the witness Newcomb. His testimony was as follows:

"I stood at the center of Munson street and Cochrane avenue. I could see 97 feet northeast of the north line of Munson street. A rod south of that, I could see 134 feet northeast of the north line; a rod south of that, 200 feet northeast of the north line. A rod south and standing in the center of Cochrane avenue, I could see 284 feet northeast of the north line of Munson street. A rod south of that, I could see 350 feet northeast of the north line of Munson street. I was then not far from 80 feet north of the center of the north track. We made some other observations south of that, but did not measure any distances to the northeast. At 80 feet I could see an individual walking on the track 350 feet northeast of the north line of Munson street. We had a buggy. I estimate that I would be all of 6 feet above the surface of the ground. A man went down the track. I made observations twice. Mr. Newcomb was there both times. The observations and measurements practically agreed at both times. I am positive about the distances I have given."

When it is understood that the distance from the north line of Munson street to the center of the track on Cochrane avenue is 249 feet, if this witness' testimony is accepted, then a man could be seen at a distance of 599 feet by one sitting in a buggy 80 feet from this track. It is also manifest, from the testimony, that as one approached the track, a view for a longer distance could be obtained, and while there is some reference to poles obscuring the view, it will be seen by a reference to the map that there was no obstruction which would seriously interfere with one approaching this crossing obtaining a view of the track for any distance in the range of vision after reaching a point within 80 feet of the track. Ordinarily this testimony would conclusively show that, had the plaintiff looked and listened and approached this crossing with

any care whatever, he would have seen or heard the approaching train.

It is sought to avoid the conclusion that the plaintiff was guilty of negligence in this regard by this line of reasoning:   It is said that the plaintiff had the right to rely upon the performance by the defendant of its statutory duties and at least to expect that the defendant's train would not approach the crossing at a rate of speed which was prohibited or unusual, and that the plaintiff should not be charged with negligence in failing to anticipate that the defendant would violate its plain duty by approaching the crossing without warning and at a dangerous and unusual rate of speed; and it is said that, because of the rate of speed at which the train was approaching at a point 80 feet from the track, the train could not have been seen, and that, if the train was not then in sight, the plaintiff could, had the train approached at a rate not to exceed 10 miles an hour, have reached and passed the crossing without harm, and that therefore, if he took an observation at this point and drove on, it cannot be said, as a matter of law, that he was guilty of contributory negligence in not continuing to look in that direction the whole distance.   It will be noticed that by the plaintiff's testimony there is nothing to indicate that he even brought his horse down to a walk at any stage.   From reading his testimony the inference would be that his horse was on a trot, or "on a little shack," as he says, up to the time that the train was directly on him.   He testifies that he then attempted to turn his horse to the right from the track, and the horse got off the track, but the buggy was struck. There is, however, testimony given by one of the defendant's witnesses, a Mr. Miller, that the horse was trotting until he came within 20 feet of the track, as he should judge, and that then the horse came down to a walk and came onto the track.   He did not stop, but continued right along.

It is a fair inference, from this testimony, therefore, that the plaintiff in traversing this distance of 80 feet

was traveling at an average rate of 5 miles an hour. It would have taken the plaintiff about 11 seconds to drive this distance of 80.80 feet. The testimony of plaintiff's witnesses as to the speed of the train at the time it reached the crossing was that it was going 30 miles an hour. While the testimony as a whole very strongly indicates a much less rate of speed at this point, the plaintiff is entitled to the benefit of this statement. Two witnesses traveling side by side, Merrill and Platt, were passed by this train a short distance north of the 569-foot point, and one of them testified that it was running from 30 to 40 miles an hour, and the other that it was running 35 miles an hour. This, taken in connection with the testimony of the plaintiff's witnesses that the rate of speed when it reached the center of Cochrane avenue was 30 miles an hour, and the admitted fact that the train was on an upgrade and with no steam on, leaves it beyond question that the speed of this train for this distance must have been, according to the testimony of plaintiff's own witnesses, from 30 to 35 miles an hour. But if 35 miles an hour be accepted as the correct rate of speed, the plaintiff must have had an unobstructed view while the train was traversing a distance of 450 feet or thereabouts before reaching the crossing, and this view was open to the plaintiff at the very time when the danger was the most imminent, and when the duty of attention to the approaching trains was most imperative. Instead of bringing his horse to a stop in order that he might the better listen, or glancing up the track where his danger might have been discovered, he drove directly onto the track without stopping. We think the negligence of the plaintiff is made out. *Shufelt* v. *Railroad Co.*, 96 Mich. 327; *Jensen* v. *Railroad Co.*, 102 Mich. 176; and *Grostick* v. *Railroad Co.*, 90 Mich. 594.

It remains to consider whether the plaintiff was entitled to go to the jury upon the claim that the defendant was guilty of gross negligence. The term "gross negligence," which excuses the contributory negligence of the plaintiff,

means in this State something more than a mere epithet characterizing the degree of negligence of which a defendant may have been guilty. The theory upon which a recovery is permitted by a plaintiff, himself guilty of contributory negligence, on the ground of defendant's gross negligence, is that where the plaintiff's precedent negligence has been discovered by the defendant or his servant, or should, by the exercise of ordinary care, have been discovered in time to have avoided the injury, and the subsequent negligence of the defendant results in an injury to the plaintiff, the previous negligence of the plaintiff is not a bar to a recovery. This rule was announced by this court in *Richter* v. *Harper*, 95 Mich. 221, and was followed in *Borschall* v. *Railway*, 115 Mich. 473. There is no testimony in this case which justifies an inference that the defendant's engineer acted maliciously, or that, after discovering the concurring negligence of the plaintiff, he failed to do all that any reasonable man could do to avert the collision. Whatever negligence he had been guilty of had occurred before his discovery of plaintiff's negligence. The case is one which appeals to the sympathy of the court; but, if we follow the fixed rules of law defining the duty of a traveler in approaching a highway crossing of a railway track, we see no escape from the conclusion that the plaintiff in this case was guilty of such concurring negligence as absolutely precludes a recovery.

The judgment will be reversed, and no new trial ordered.

Ostrander, Moore, McAlvay, and Brooke, JJ., concurred.